UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

DAMEION ROBINSON,

Petitioner,

v.

JAMES BRUTON, Warden,

Respondent.

Civil File No. 00-1380 (JMR/FLN)

**REPORT AND RECOMMENDATION**

Michael F. Cromett, Assistant State Public Defender, for Petitioner.

J. Michael Richardson, Assistant County Attorney, Hennepin County, Minnesota, for Respondent.

THIS MATTER is before the undersigned United States Magistrate Judge on Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254. (Docket No. 1.) Respondent has filed a return contending that the petition should be denied. (Docket Nos. 5, 6 and 7.) The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it is recommended that the petition for writ of habeas corpus be denied and that this action be dismissed with prejudice.

## I. BACKGROUND[1]

Petitioner is challenging his 1998 state court conviction for first degree murder. A

[1] The trial transcript in this case consists of eleven volumes -- eight of which are consecutively paginated. The other three miscellaneous volumes, (apparently prepared by substitute court reporters), are separately paginated. Hereafter, the abbreviation "Tr." followed by a number refers to a page number in the eight consecutively-paginated volumes of the trial transcript.

FEB 09 2001
FILED
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Hennepin County jury found him guilty of killing a crack cocaine dealer named Derangle "Dino" Riley during the early morning hours of Sunday, August 24, 1997. At Petitioner's trial, the prosecution presented evidence showing the following:

During the evening of Saturday, August 23, 1997, a number of people were gathered at the home of Leonard Slaughter in South Minneapolis. Leonard's son, Saint, lived at the home with his girlfriend, Alayna Hanson, and their children. Petitioner, who is Saint's cousin, was one of the people visiting at the house that night. Petitioner's brother, Danny, was there, a woman named Cassandra Hodge was there, and a friend of Saint's named Traviore Gaston was also there. Gaston's wife Melissa was present too, although she spent at least part of the evening in her car because she was not feeling well. Saint, Hanson and Traviore Gaston all testified that Petitioner had a .25 caliber handgun with him that night. The gun had a pink pearl handle. Saint and Gaston said that they saw Petitioner fire the gun in the air that night.[2]

Dino Riley was also at Saint's home that night, and he had some crack cocaine with him that he was trying to sell. Petitioner expressed an interest in buying Riley's crack, but the transaction was not completed because they were unable to agree on a price. At some point during the evening Saint left his home to visit another girlfriend named Letrice Stanley. Both Saint and Stanley testified that they spent the night together at Stanley's

---

[2] A short time after Riley's murder, the police searched the yard at the Slaughter residence without finding any bullet shells. When they returned to the yard at a later date, however, Saint Slaughter, or someone who was with him, pointed out a shell on the ground. The shell was found in an area that had been searched previously, leading the police to conclude that it had been deliberately placed there by someone. At petitioner's trial, the prosecution conceded that the shell found in Slaughter's yard had been "planted." (Tr. 1167.)

home. (Petitioner later told the police that he knew Saint was with Stanley that night.)

Late that evening, or perhaps shortly after midnight, Jeffrey Carberry and Jody Gronlund came over to the Slaughter residence to try to buy some cocaine from Riley. Riley was in his car when Carberry and Gronlund arrived, and Carberry got into Riley's car to make his purchase. At approximately the same time, Alayna Hanson, and Traviore and Melissa Gaston were preparing to leave the Slaughter residence to get some cigarettes. All three of them noticed that Petitioner was near Riley's car as they were leaving for the store. As Carberry and Jody Gronlund were completing their drug purchase they too saw a man near Riley's car. They did not know Petitioner at the time, but in a subsequent police photo line-up, they both identified Petitioner as the man they saw with Riley. At Petitioner's trial, Gronlund testified that after she and Carberry completed their drug purchase and were preparing to leave, she saw the man (Petitioner) move into the front passenger seat of Riley's car. Shortly thereafter, Carberry and Gronlund drove away from the Slaughter house, and they saw Riley's car drive away immediately behind them. Riley's car followed them for a short distance, and then the two cars went in different directions.

The Gastons and Alayna Hanson were back from their cigarette run within ten minutes after they had departed. By then, however, everyone else (Riley, Petitioner, Carberry and Gronlund) had left. Petitioner returned to the Slaughter home a short time later, but he said nothing about where he had been. He did not stay very long before leaving again with his brother, Danny.

After Petitioner and his brother left the Slaughter home, they apparently went to the nearby home of Bob Letourneau. Petitioner asked Letourneau to give them a ride over to Cassandra Hodge's home, and Letourneau complied. Later, Letourneau took Petitioner, his brother, and Hodge to the home of Jody Gronlund – the same woman who, along with Jeff Carberry, had purchased crack cocaine from Dino Riley a few hours earlier.[3] When Petitioner entered Jody Gronlund's home, she recognized him as the same man she had seen get into the front passenger seat of Riley's car just before Riley drove away from the Slaughter house. Petitioner produced some crack cocaine, which Jody Gronlund described as looking similar (in packaging and quantity) to the crack that Riley had been selling earlier that night.

Around dawn the next day, Letourneau gave Petitioner a ride to the home of Melinda Franklin, one of Petitioner's girlfriends, who lived in St. Paul. When Petitioner arrived at Franklin's home, she was not happy to see him. They had an argument, and Petitioner volunteered to leave if Franklin would give him a ride to North Minneapolis. She agreed, and they left for North Minneapolis.

At approximately the same time that Petitioner arrived at Melinda Franklin's home in St. Paul, Saint Slaughter left Letrice Stanley's place and walked toward his own home. Along the way, Saint passed a car that had crashed into the side of a church building.

[3] A woman named Jill Gronlund – Jody's sister – was with Bob Letourneau that evening. She and her companions that night – Letourneau, Petitioner, Petitioner's brother, and Hodge – were looking for a motel room that could be used for smoking crack. After searching unsuccessfully for such a place, they went to Jody Grondlund's house and asked whether they could "rent" her basement. Jody agreed to let Petitioner, his brother and Hodge use her basement in exchange for some crack.

Saint looked through the car window and discovered the body of his friend, Dino Riley. He could tell just by looking through the window that Riley was dead. Saint ran home and told Alayna Hanson what had happened to Riley. Hanson insisted that he call 911 to report the matter, and Saint did so. He met the police at Riley's car, and he spent much of the rest of the day talking to the police.

The police determined that Riley had been shot in the head at close range by a .25 caliber gun. It was further determined that he had probably died sometime before 3:30 that morning. Several people, (Alayna Hanson, the Gastons, Jeff Carberry and Jody Gronlund), had seen Riley at the Slaughter residence around midnight, so the police concluded that he must have been shot between then and 3:30 a.m. Riley's pants pocket was turned out, and no drugs or cash were found in his possession.

As Petitioner and Melinda Franklin were heading for North Minneapolis that Sunday morning, Petitioner asked Franklin to stop at Saint Slaughter's home so that he could pick up a dog kennel he had left there. When they arrived, Petitioner talked to Alayna Hanson and asked her where Saint was. Hanson told Petitioner that Saint was not home, and she then explained that Riley had been killed and that Saint was at the murder scene. According to Hanson, Petitioner showed no reaction to the news of Riley's murder -- he asked no questions and made no comments; he simply picked up his dog kennel and left.[4] Melinda Franklin then took Petitioner up to North Minneapolis and

---

[4] Hanson also noted that she had mistakenly pointed the wrong direction when she indicated where Saint had gone, but a few minutes later, while Petitioner was talking to Saint's father, he (Petitioner) seemed to know the correct direction of the murder scene. (Tr. 535-37.)

dropped him off at a street corner. Petitioner told Franklin he was going to meet some friends who lived in the area, but Franklin suspected that he was really planning to visit another girlfriend -- Wendy Owens.

Later that same Sunday, (August 24, 1997), a man named Johnny Edwards met with three North Minneapolis men who wanted to buy a handgun. Edwards was accompanied by another man. At Petitioner's trial, all three of the would-be gun purchasers testified that the man with Edwards was Petitioner.[5] Two of the men testified that while they were talking to Edwards about the terms of the gun purchase, Petitioner suddenly pulled out a gun -- a .25 caliber handgun with a pink pearl handle -- and announced that he intended to rob them. He forced the two men to lie down, took their money and then told them to take their clothes off and go into the bathroom. One of the men refused to follow Petitioner's instructions, and Petitioner shot him in the back of the leg. As he fled outside, Petitioner shot the third man in the chest. Based on a bullet recovered at the crime scene, the police determined that the gun used during the North Minneapolis robbery and shooting was the same gun that had been used to murder Dino Riley.[6]

Within hours after the North Minneapolis robbery, Petitioner was apprehended and taken into custody. He was later charged with first degree murder for killing Riley. At his trial, Petitioner's defense theory was that someone else -- probably Saint Slaughter -- had

---

[5] A woman named Evelyn Dawson also testified that she saw Petitioner with Edwards earlier that day when Edwards was looking for the men who wanted to buy the gun from him.

[6] At Petitioner's trial, the defense readily conceded that the bullet casing found at the scene of the North Minneapolis robbery matched the bullet casing involved in Riley's murder. (Tr. 1249.)

actually committed the murder. Petitioner's North Minneapolis girlfriend, Wendy Owens, testified that Petitioner was with her during the day and evening when the North Minneapolis robbery occurred. The defense argued that the person who committed the robbery probably killed Riley as well, and that, given Owens's alibi testimony, that person could not have been Petitioner.

During closing arguments at Petitioner's trial, the prosecuting attorney made several remarks that drew objections from Petitioner's defense counsel. Petitioner's attorney complained that the prosecution was attempting to shift the burden of proof onto the defense.

The first objection came after the prosecutor discussed a statement that Petitioner had made to police following his apprehension. In an effort to explain how he had acquired crack cocaine on the night of Riley's murder, Petitioner told the police that he had walked to a "crack house" near the Slaughter residence and bought his crack there. In response to this explanation, the prosecutor said:

> "[Petitioner] says that he pages this man [presumably referring to the crack dealer] and he calls him on the telephone. If that's true, why is it nobody else sees this? Why isn't there one witness, one of his friends, that can confirm that point?" (Tr. 1188.)

The trial court judge sustained the defense's objection to this remark, and the prosecutor immediately acknowledged:

> "There's no question that they don't have the burden of proof. But not one witness that we presented ever said that they saw this man [i.e., Petitioner] on the telephone or paging someone for crack/cocaine." (Tr. 1188.)

The defense attorney later objected to certain comments made by the prosecutor pertaining to Petitioner's alibi witness, Wendy Owens. During her trial testimony, Owens acknowledged that on December 9, 1997, she had told a defense investigator that she was at her mother's house when she first saw Petitioner on the morning of Sunday, August 24, 1997, (the day of the North Minneapolis robbery). During a subsequent interview with the investigator, and at trial, Owens corrected herself and said that she first saw Petitioner that day at her own home. The prosecutor wanted the jury to infer that Owens changed her story about where she first saw Petitioner that day, because she knew her mother could not corroborate (and might contradict) the original version. Thus, the prosecutor said to the jury –

> "If you get the sense that somebody talked to the mom to see if Dameion Robinson was over there after this December 9th conversation and mom couldn't – " (Tr. 1196.)

The defense attorney interrupted the prosecutor's remark with an objection, contending that the prosecutor was "arguing facts not in evidence." (Tr. 1196.) The trial court sustained the objection, and the prosecutor then said "I mean, commons sense tells you that if another witness sees it, they could corroborate it." (Tr. 1196.) Defense counsel objected again, this time arguing "[w]e don't have the burden of proof." That objection was overruled, and the prosecutor followed up by telling the jury –

> "I'm not suggesting the defense has the burden of proof. I am suggesting that this testimony of this woman [Wendy Owens] is a bold-faced lie. It's a lie. She stood up here, took the oath to tell the truth, and she lied to you. Because if this were true, it could be corroborated by her mother and its not." (Tr. 1196.)

The prosecutor also believed that Owens changed her story about why she had such a clear memory of August 24, 1997. Apparently, Owens first told the defense investigator that she remembered that date because it was the day after a memorable family birthday party. At trial, however, Owens did not mention the birthday party, but claimed that she remembered the day because it was just before Petitioner was arrested. The prosecutor evidently wanted the jury to infer that Owens was trying to back away from her statements about the birthday party, because those statements could not be corroborated. Referring to Owens, the prosecutor argued –

> "[N]ow she says in her testimony that, 'The reason I remember this date is because it was' – after prodding from counsel – 'it was because it was the day before my boyfriend's arrest.' But when she speaks to the crack team of investigators, [Owens purportedly said] 'the reason I remember that is because we had a birthday party.' It was a birthday party. Not a birthday, a birthday party. You have people at a party. Sometimes you take photographs at a party. If you have people at a party, you have some corroboration but you don't --" (Tr. 1197.)

At that point, defense counsel again interrupted with an objection, arguing again that "we do not have to call witnesses." (Tr. 1197.) The trial court sustained the objection, and the prosecutor continued:

> "There's no question that the defense does not have any burden of proof. No question they do not have to call witnesses. But what I am suggesting to you is that this woman lied because the story can't be backed up because she keeps changing it. She's lying about that. So that's their airtight alibi that disproves the North side robbery." (Tr. 1197.)

The prosecutor made one other remark that did <u>not</u> elicit an objection from defense counsel, but which Petitioner now cites in support of his request for habeas corpus relief. That remark pertained to certain evidence indicating that Petitioner had his dog with him

when he left the Slaughter residence for the last time on the night of the murder, but he later did not have the dog with him. During closing argument, the prosecutor tried to argue that Petitioner probably hid the murder weapon at the same place where he left his dog. The prosecutor told the jury:

> "So [Petitioner] goes someplace else, someplace we'll never know, someplace that he knows, some place that Danny Robinson [Petitioner's brother] knows, but he goes someplace else and he deposits that dog and then he has an opportunity to remove that weapon...." (Tr. 1174.)

Again, the defense attorney did not object to this part of the prosecutor's closing.

At the conclusion of the Petitioner's trial, the jury found him guilty of first degree murder. A few weeks later, he was sentenced to life in prison. Following his conviction, Petitioner filed a direct appeal in the Minnesota Supreme Court,[7] in which he raised the following claims: (1) the prosecutor violated his due process right to a fair trial by making improper remarks to the jury; (2) the evidence pertaining to the North Minneapolis robbery and shootings should have been excluded; (3) the indictment that precipitated Petitioner's trial and conviction was invalid; and (4) there was insufficient evidence to support the conviction. The Supreme Court rejected all of Petitioner's claims on the merits, and affirmed his conviction and sentence. State v. Robinson, 604 N.W.2d 355 (Minn. 2000).

On June 5, 2000, Petitioner filed his present application for federal habeas corpus relief under 28 U.S.C. § 2254. The instant petition lists a single claim for relief -- that Petitioner was deprived of his constitutional right to a fair trial because of several allegedly

---

[7] Under Minnesota law, appeals in first degree murder cases are taken directly to the State Supreme Court, rather than the Minnesota Court of Appeals. Minn.Stat. § 632.14.

improper remarks made by the prosecutor during closing argument. Respondent concedes that Petitioner has fully exhausted his state court remedies and that his claim can properly be decided on the merits. For the reasons discussed below, the Court concludes that Petitioner is not entitled to a writ of habeas corpus.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standards that govern this Court's review of habeas corpus petitions filed by state prisoners. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts. The Court pointed out that

> "a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a conclusion opposite to ours."

Id. at 1519 (emphasis added).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Id. at 1523.

The Court further explained that

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 1521-22 (emphasis added).

"In assessing the reasonableness of the state court's treatment of the issues, we look to federal court decisions of factually similar cases." Basile v. Luebbers, No. 00-1771 (8th Cir. Jan. 9, 2001), 2001 WL 15747 at *1.

In sum, a federal court is not free to conduct its own de novo review of a state prisoner's constitutional claims. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams.

## III. DISCUSSION

In this case, Petitioner challenges the Minnesota Supreme Court's resolution of his prosecutorial misconduct claim, arguing that his due process right to a fair trial was

violated in two respects. First, he contends that his conviction should have been overturned because the prosecutor made remarks that effectively shifted the burden of proof from the prosecution to the defense. Second, he contends that the prosecution violated his right to due process, (and his privilege against self-incrimination), by alluding to the fact that he did not testify at trial.

Our Court of Appeals has prescribed a two-question analysis for adjudicating prosecutorial misconduct claims. First, did the prosecutor actually do something improper? Second, if the prosecutor did something improper, did his or her misconduct violate the petitioner's federal constitutional rights? See U.S. v. Plumley, 207 F.3d 1086, 1094 (8th Cir. 2000) ("[i]n order to prove prosecutorial misconduct, a defendant must show that (1) the prosecutor's remarks were improper, and (2) the remarks prejudicially infected the defendant's substantial rights so as to deprive him of a fair trial").

Prosecutorial misconduct does not merit habeas corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's due process right to a fair trial. Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998), cert. denied, 525 U.S. 1073 (1999), citing Darden v. Wainwright, 477 U.S. 168, 181 (1986). Improper remarks by a prosecutor during a closing argument violate due process only when they are "so egregious that they fatally infected the proceedings and rendered [the Petitioner's] entire trial fundamentally unfair." Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir. 1985); see also, Wycoff v. Nix, 869 F.2d 1111, 1113 (8th Cir.), cert. denied, 493 U.S. 863 (1989). "'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.... Rather, the 'relevant question is whether the prosecutors' comments so

infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996), cert. denied, 520 U.S. 1109 (1997), quoting Darden v. Wainwright, 477 U.S. at 181.

Thus, a habeas petitioner

> "bears the heavy burden of showing 'that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair. Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety, the verdict probably would have been different.'"

Mack, 92 F.3d at 643, (emphasis added), quoting Jones v. Jones, 938 F.2d 838, 844-45 (8th Cir. 1991). When assessing whether a habeas petitioner has met this "heavy burden," a federal court must examine the totality of the circumstances in order to determine whether there is a reasonable probability that the challenged remarks affected the outcome of the trial. Roberts, 137 F.3d at 1066, citing Newlon v. Armontrout, 885 F.2d 1328, 1336-37 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990), and Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir. 1995), cert. denied, 516 U.S. 1067 (1996).

The instant Petitioner's two claims of prosecutorial misconduct must be evaluated with these principles in mind.

A. Shifting The Burden Of Proof

Petitioner initially claims that the prosecutor acted improperly by suggesting to the jury that his alibi witness, Wendy Owens, was untrustworthy. The prosecutor tried to convince the jury that Owens's testimony should be rejected because she twice changed her story upon realizing that her original story could be challenged for lack of

corroboration.

First, the prosecutor suggested that Owens changed her story about where she initially saw Petitioner on the day after the murder. Owens initially said that she first saw Petitioner at her mother's house. According to the prosecutor, Owens changed her story, (claiming that she first saw Petitioner at her own home), when she realized that her mother might not corroborate her original statement. The prosecutor secondly suggested that Owens changed her explanation as to why she had such a clear recollection of the events of August 24, 1997. According to the prosecutor, Owens stopped saying that it was a memorable birthday party that facilitated her memory, because she realized she could not prove that such a party had occurred. Petitioner claims that by making these two arguments, the prosecutor was attempting to shift the burden of proof in this case from the prosecution to the defense.

**(i) Was the prosecutor's argument improper?**

Applying the first step of the prescribed analysis, the Court finds that the prosecutor's arguments challenging Owens's credibility were <u>not</u> improper. The prosecutor's arguments cannot be viewed as an improper attempt to shift the burden of proof for two reasons.

First, it does not appear that the prosecutor was actually suggesting that the defense had any obligation to corroborate anything. The prosecutor was <u>not</u> arguing that the jury should reject Owens's testimony about the specific factual matters at issue -- i.e., when she first saw Petitioner and whether there was a birthday party. Rather, the prosecutor was suggesting that Owens was untrustworthy in general, because she

changed her statements about those matters. The prosecutor articulated his argument most succinctly when he said: "I'm not suggesting the defense has the burden of proof. I am suggesting that this testimony of this woman [Owens] is a bold-faced lie." (Tr. 1196.)

Moreover, even if the prosecutor was arguing that Owens's testimony should be rejected because it lacked corroboration, his remarks still were not improper. Prosecutors are not wholly precluded from mentioning the weaknesses in a defendant's case. "The prosecution may comment on the defense's failure to present evidence to contradict the State's case 'unless the defendant alone had the information to do so.'" Sidebottom v. Delo, 46 F.3d 744, 759 (8th Cir.), cert. denied, 516 U.S. 849 (1995), quoting Richards v. Solem, 693 F.2d 760, 766 (8th Cir. 1982), cert. denied, 461 U.S. 916 (1983). Petitioner does not suggest that he alone could have corroborated Owens's testimony. The corroboration to which the prosecutor was referring presumably would have had to come not from Petitioner, but from Owens's mother and someone who attended the birthday party. Therefore, the Court finds no impropriety in the prosecutor's remarks concerning an alleged lack of corroboration.

In U.S. v. Cabrera, 201 F.3d 1243 (9th Cir. 2000), the Ninth Circuit Court of Appeals addressed a claim quite similar to the one raised by Petitioner here. In Cabrera, the prosecutor urged the jury to reject testimony offered by the defendant himself, because it lacked corroborating evidence. While frequently reminding the jury that the defendant did not have the burden of proof, the prosecutor in Cabrera emphasized that defendant's

testimony lacked corroboration.[8] The Court of Appeals rejected the defendant's prosecutorial misconduct claim holding that:

> "The prosecutor's comments did not shift the burden of proof or persuasion. A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify."

---

[8] The Court of Appeals' decision includes the following synopsis of the prosecutor's remarks:

> "Discussing Cabrera's credibility as a witness, the prosecutor stated:
>
> > 'Now, I am not saying he has -- that the burden is ever shifted to him. The Government has the burden of proving this case, but in evaluating his testimony, you can go through his motivation, you can go through his perceptions, the same things that you have to look at all of the witnesses that testify in our case should be applied to him as well.'
>
> The prosecutor reminded the jury that, 'again, he doesn't have the burden of proof.' He then stated: 'I ask you to evaluate his testimony. Has that been corroborated? Have you heard from his wife that he called the other night? In evaluating his testimony you can evaluate those things.' The prosecutor also asked, 'Does his friend come in and corroborate his testimony? Didn't hear from him. Did you hear about -- did Armando come in and tell you that he was giving [Cabrera] a favor -- or he asked him to do a favor for [Cabrera]?' Finally, during his rebuttal argument, the prosecutor reiterated that:
>
> > The Government has never shifted the burden to the defendant. The Government accepts its burden of proving the case beyond a reasonable doubt.... The Government never asked you to speculate. What we did is ask you to draw inferences based on the evidence.... The Government has never asked the defendant to prove his innocence. In asking about the corroboration, simply we were pointing out -- I was pointing out that there could have been corroboration for his story.'"

201 F.3d at 1249.

Id. at 1250 (emphasis added).

In the instant Petitioner's case, the prosecutor never suggested that Wendy Owens's testimony should have been corroborated by Petitioner himself. Therefore, according to Carbrera, the prosecutor could properly raise a corroboration question without violating Petitioner's Fifth Amendment rights. It follows that the prosecutor's corroboration questions in this case should not be viewed as improper.

**(ii) Did the prosecutor's comments alter the outcome of the trial**

Even if the prosecutor's remarks about Owens's testimony were improper, Petitioner has failed to demonstrate that those remarks deprived him of a fair trial. There are several factors that lead this Court to conclude that the remarks in question had little, if any, effect on the outcome of the trial.

First, the prosecutor's comments were not directly pertinent to any fundamental factual issue in the case. Whether Owens first saw Petitioner at her own home or her mother's home was not a critical factual issue in this case. Likewise, whether Owens attended a birthday party on the day before she saw Petitioner is not a critical issue in this case. Both of these issues were purely collateral. Viewed against the background of the trial as a whole, those two issues nearly vanish into obscurity.

Second, the prosecutor repeatedly reminded the jury that the State, not the defense, had the burden of proof at Petitioner's trial. After the first objection by the defense attorney, (on the subject of where Owens first saw Petitioner), the prosecutor said "I'm not suggesting the defense has the burden of proof." (Tr. 1196.) After the second objection, (concerning the birthday party), the prosecutor told the jury "[t]here's no question that the

defense does not have any burden of proof." (Tr. 1197.) The trial court judge also reminded the jury, as part of the instructions given at the close of the trial, that: "The burden of proving guilt is on the state. The defendant does not have to prove innocence." (Tr. 1257.) If anything, it appears that the jury in Petitioner's case received more reminders than most juries about who does, and who does not, have the burden of proof. With all those reminders, it is hard to imagine how Petitioner's jury could have been confused about who had the burden of proof.

Finally, the state presented substantial evidence to support its charges against Petitioner. Five witnesses saw Petitioner (or someone who looked like him) near Riley's car at the time when Riley was last seen alive. Several witnesses saw Petitioner with a gun like the one used to kill Riley. Before Riley was killed, Petitioner was trying to buy crack cocaine from Riley; but after the murder, Riley had no crack in his possession, while Petitioner had crack for himself and others. Four witnesses involved in the North Minneapolis robbery and shootings testified that Petitioner was involved in that incident; and the gun used in that incident was the same as the one that was used to kill Riley.

At the same time, Petitioner's defense theory – that Saint Slaughter probably was the real murderer – was very weak. It does not appear that anyone saw Slaughter with Riley near the time of the murder. Before Letrice Stanley knew that Slaughter was using her as an alibi, Stanley told the police that Slaughter was with her when the murder occurred. More significantly, perhaps, Petitioner himself told the police that Slaughter had been at his "other girlfriend's house" on the night of the murder. (Tr. 1014.) Furthermore, it is difficult to imagine how Slaughter could have executed the type of conspiracy

suggested by Petitioner's defense theory. Slaughter would have had to manipulate the testimony of most of the prosecution's numerous eye witnesses -- many of whom had no apparent connection to Slaughter.[9] Thus, looking at the record as a whole, the Court finds that Petitioner was convicted on the basis of the evidence presented at his trial, not on the basis of the prosecutor's closing remarks about Wendy Owens's testimony.[10]

---

[9] The Court finds the testimony of Jody Gronlund to be particularly important. As far as the Court can tell, she had no motivation to protect Slaughter, and no motivation to falsely accuse Petitioner. She testified that she saw someone who looked like Petitioner in the backseat of Riley's car when Riley was last seen alive. She also saw that same person get into the front passenger seat of Riley's car, and she then saw Riley's car drive away. Later that night she saw Petitioner come to her house with crack cocaine that appeared to be similar to the crack that Riley had been trying to sell a few hours earlier. Jody Gronlund was certain that the person who got into the car with Riley was the person who came to her house later that night with the crack. (Tr. 888.) Moreover, Petitioner himself acknowledged to police that he did indeed go to Jody Gronlund's house with Bob Letourneau and Jill Gronlund, (Jody's sister). (Tr. 1013.) Jody Gronlund's testimony clearly indicates that Petitioner was in the front seat of Riley's car shortly before Riley was killed, and that Petitioner probably robbed Riley of his crack cocaine and cash.

[10] In his petition and in the "Statement of Facts" section of his supporting memorandum, Petitioner alludes to one other alleged instance when the prosecutor purportedly attempted to shift the burden of proof from the prosecution to the defense. That occurred when the prosecutor was talking to the jury about Petitioner's activities on the night of Riley's murder. The prosecutor said: "[Petitioner] says that he pages this man [a drug dealer] and he calls him on the telephone. If that's true, why is it nobody else see this? Why isn't there one witness, one of his friends, who can confirm this point?" (Tr. 1188.) Although Petitioner does not mention this comment in the "Argument" section of his supporting memorandum, the Court has considered it, and finds that it does not aid his prosecutorial misconduct claim.

As discussed in the text, a prosecutor's comment on the lack of corroboration for the defendant's theory of the case is not inherently improper, as long as the prosecutor does not imply that the defendant himself should have testified, (which would infringe on the privilege against self-incrimination). <u>See</u> <u>Carbrera</u>, <u>supra</u>. Here, the prosecutor did not imply that Petitioner should have taken the stand; he asked why <u>other witnesses</u> could not confirm Petitioner's statements to the police. Furthermore, even if the prosecutor's comment about the lack of supporting witnesses were improper, that comment did not change the outcome of Petitioner's trial. The prosecutor's remark was not directly

B. Improper Comment On Petitioner's Failure To Testify

Petitioner also contends that the prosecutor acted improperly by drawing the jury's attention to the fact that Petitioner elected not to testify at his trial. This argument is based on the prosecutor's statement regarding Petitioner's whereabouts on the night of the murder; i.e., that Petitioner went "someplace else, someplace we'll never know, someplace that he knows...." (Tr. 1174.) If that statement was intended to call the jury's attention to Petitioner's decision not to testify, or if the statement had the effect of calling the jury's attention to Petitioner's absence from the witness stand, then the prosecutor acted improperly. U.S. v. Triplett, 195 F.3d 990, 995 (8th Cir. 1999) ("[i]t is... well established that prosecutorial misconduct occurs when the prosecutor comments at trial, directly or indirectly, on the defendant's failure to testify"), cert. denied, 120 S.Ct. 1735 (2000), (emphasis in the original). But again, improper comments by a prosecutor do not automatically warrant habeas corpus relief. As discussed above, a habeas petitioner must also demonstrate that the prosecutor's improper comments probably changed the outcome of his trial. Mack 92 F.3d at 643.

Looking at Petitioner's trial in its entirety, the Court finds that the prosecutor's observations about Petitioner's whereabouts on the night of the murder did not cause Petitioner's trial to be fundamentally unfair. This conclusion is based on three considerations.

---

pertinent to Petitioner's guilt or innocence; the remark was followed by an explicit reminder that the defense had no burden of proof, (Tr. 1188); and the remark appears relatively inconsequential when compared to the evidence of Petitioner's guilt.

First, the Court notes that the prosecutor's comments elicited no contemporaneous objection from defense counsel. Although Petitioner's defense attorney objected regularly during the prosecutor's closing argument, she did not say anything when the prosecutor supposedly called the jury's attention to Petitioner's failure to testify. The silence of Petitioner's counsel suggests that she did not find the prosecutor's comment to be problematic. If the prosecutor's comment warranted no objections of any kind from Petitioner's defense attorney, how can this Court find that the comment was so objectionable that it effectively destroyed Petitioner's right to a fair trial? Moreover, by failing to object, Petitioner's counsel deprived the prosecutor of an opportunity to explain and defend his comment. Petitioner's counsel also deprived the trial court judge of an opportunity to consider the possible harm, if any, caused by the prosecutor's remark, and the opportunity to give an immediate instruction that could have cured any possible impropriety.[11]

---

[11] The fact that Petitioner's attorney did not object to the prosecutor's remark suggests that there could have been a procedural default in this case. It seems unlikely that the Minnesota Supreme Court would have addressed and decided Petitioner's present claim on the merits, if he failed to raise it in a timely manner in the trial court. And, in fact, there appears to be no discussion of the failure-to-testify claim in the State Supreme Court's decision. This leads the Court to wonder whether Petitioner may have deliberately declined to raise the failure-to-testify claim on direct appeal, because he knew it had been waived due to lack of objection at the trial court level. If the specific issue now before this Court was not fairly presented to, and decided on the merits by, the Minnesota Supreme Court, then the issue was procedurally defaulted. See McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) ("before we may reach the merits of a habeas petition, we must first determine whether the petitioner has fairly presented his federal constitutional claims to the state court").

However, Respondent has not argued procedural default in this matter. To the contrary, Respondent has expressly conceded exhaustion, which presumably means the State is satisfied that every issue presented here has been properly presented to, and

The Court secondly notes that the jury was expressly instructed that Petitioner had a constitutional right not to testify in this case, and that no adverse inference should be drawn from the Petitioner's decision to exercise that right.[12] That instruction should have minimized any harm that might have been caused by the prosecutor's remark about Petitioner's whereabouts on the night of the murder. See Rodriguez v. Peters, 63 F.3d 546, 562 (7th Cir. 1995) (judge's instruction that jury should not consider defendant's failure to testify tended to nullify the prosecutor's allegedly improper comment about it).

Finally, it is noted once again that the evidence supporting the state's theory of the case was substantial, while the evidence supporting the defense's theory of the case was meager. (See discussion at pp. 18-19, supra.) Given the substantial amount of evidence that the jury had to consider in this case, it is not likely that a single innocuous phrase uttered by the prosecutor, (and unchallenged by the defense), altered the outcome of the trial. It is more likely that the jury's verdict was based on an honest and unbiased assessment of the evidence supporting the charges against Petitioner.

---

decided by, the Minnesota Supreme Court. Simply put, if there were a valid procedural default argument here, Respondent has waived it -- which is why Petitioner's second prosecutorial misconduct claim is addressed on the merits here

.

[12] The jury received the following instruction:

"Defendant has no obligation to prove himself innocent. Defendant has the privilege not to testify in the defendant's own defense. This privilege is guaranteed by the federal and state constitutions. You should not draw any inference from the fact that defendant has not testified in this case." (Tr. 1264.)

## IV. CONCLUSION

For the reasons discussed above, the Court concludes that Petitioner has not met his "heavy burden" of showing that his trial was "fatally infected" by prosecutorial misconduct. The Minnesota Supreme Court reached the same conclusion on Petitioner's direct appeal. This Court does not find the state court's decision to be contrary to, or to involve an unreasonable application of, any relevant constitutional rule. Therefore, Petitioner's application for a writ of habeas corpus must be denied – on the merits, and with prejudice.

## V. RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1. Petitioner's application for a writ of habeas corpus, (Docket No. 1), be **DENIED**; and

2. This action be **DISMISSED WITH PREJUDICE**.

DATED: February 8, 2001

Franklin L. Noel

FRANKLIN L. NOEL
Chief Magistrate Judge

Under D.Minn. L. 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by 2-23-01, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Court of Appeals.